RICHARD SEGERBLOM, ESQ.
Nevada Bar No. 1010
704 South Ninth Street
Las Vegas, Nevada 89101
Tel: (702) 388-9600
Fax: (702) 385-2909

Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

JANICE BATES,

                Plaintiff,

vs.

CLARK COUNTY,

                Defendant.

CV-S-04-0518 KJD GWF

## <u>OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

COMES NOW Plaintiff JANICE BATES and opposes the Defendant's motion for summary judgment on the grounds that there are genuine issues of material fact with respect to her Title VII retaliation claim arising from the denial of a promotion in August, 2000.  BATES does not challenge the County's decision in December, 2001, to put her into a grant funded position since she has since moved on to a permanent position and thus that issue is moot.

/

/

/

/

This opposition is based upon the pleadings and papers on file together with the attached points and authorities and exhibits.

DATED this _12th_ day of June , 2006.

RICHARD SEGERBLOM, ESQ.
704 South Ninth Street
Las Vegas, NV 89101

## POINTS AND AUTHORITIES

### Factual Background

Janice Bates has worked for Clark County since 1996. In 2000, Bates was employed in the County's Equal Opportunity Division under the supervision of George Cotton. Cotton, who originally reported directly to the County Manager, had been demoted and placed under the Human Resource Director in 1998. As a result of that demotion and reassignment, Cotton filed a charge of discrimination and a lawsuit against the County.

In this lawsuit Bates alleges she was denied a reclassification which would have resulted in a promotion because of the County's animosity towards Cotton. Bates' arises from the EEOC's investigation which concluded that the County "retaliated against a class of individuals who were supervised by [Cotton]." PE 1. Bates is one of those individuals, all of whom were employees of the EOD which Cotton ran.

The County's factual summary about the circumstances surrounding Bates' claim is largely accurate, and thus she won't repeat it here. However, it is critical to note that the County's articulated reason for denying Bates' the promotion at issue - Assistant County Manager Mike Alastuey's belief that the Department of

2

Human Resources was granting too many promotions - is inadmissible hearsay since it does not come from Alastuey's mouth, but rather is comes from the affidavit of Ray Visconti who quotes Alastuey.

Since Bates does not dispute the basic facts in the County's motion she will focus on the evidence of pretext which she believes is sufficient to create a question of fact. First, the deposition testimony of Terry Lamuraglia, who was the Assistant Director of Human Resources in 1998. According to Mr. Lamuraglia:

> A: I know there was a ceiling on the E.O.D. division. There was a ceiling there. It was put there. That was it. There was no way around that one. That's what you're told. That's what you do. and foremost, since based upon that charge which was ongoing in 2000.
>
> . . .
>
> A. I was directed that along with Bonnie Rinaldi had directed me at that time not to reclassify individuals in those divisions. She specifically said – she wrote a note. . . .

There will be no reclassification in E.O.D. and I told her at that time that wouldn't be correct. Lamuraglia Dep., PE 2, 99:18-102-5. Obviously this testimony by the Assistant Human Resources Director that an Assistant County Manager, Bonnie Rinaldi, directed him not to reclassify EOD employees is strong evidence of pretext.

Other evidence of pretext comes from the affidavit of George Cotton. According to Mr. Cotton:

Since the filing of my own charge of Title VII discrimination against Clark County, there has been a noticeable difference in the way reclassifications and/or promotions are administered. All of the reclassifications occurring within the Human Resources Department have been competed without any

3

of the dubious audit functions being performed, and the Division [EOD] has been totally excluded from receiving any such promotion advancements. . . . It appears that any employee who has ever associated himself or herself with me as an employee of the Clark County Equal Opportunity Division has experienced the effects of retaliation and has been the recipient of ongoing adverse employment actions as a result of such workplace association with me. Cotton Affidavit, PE 3.

Cotton's affidavit testimony is admissible and direct evidence that EOD employees were treated differently that other Human Resources employees.

Finally, there's the affidavit of Barbara Bell, a former EOD employee who transferred to another HR division in 1998. According to Bell:

[W]hile EOD is and has been a division of HR for about three (3) years, until recently, EOD employees were openly excluded from HR promotional opportunities. Language such as "centralized HR experience only," were added to the minimum qualifications, which barred EOD employees from qualifying for other positions within HR, since the division was physically located on a different floor. Bell Affidavit, PE 4.

Bell's affidavit testimony is also admissible and direct evidence of different treatment.

Finally, there is the testimony from Bates who was told by an employee in the Finance Department:

I feel comfortable telling you this because I'm leaving but I was told not to even forward any paperwork for reclassification, promotion, or anything for anybody that worked for George Cotton in retaliation for him filing a lawsuit against the county. Bates Dep., DE 1, 42:16-21.

Obviously this is direct testimony by a Finance Department employee who was directed not to reclassify EOD employees because of Cotton's protected activity.

4

## **Legal Argument**

### A.    **Bates' Title VII Charge was Timely Filed with the EEOC**

The County asserts that Bates did not file her charge of discrimination within the 180 day limit and thus her case is untimely. The County ignores Supreme Court and Ninth Circuit precedent in making that assertion, since the Supreme Court ruled that a claimant may file with the EEOC within 300 days if the EEOC then defers jurisdiction to the state agency, and that deferral may be informal. EEOC v. Commercial Office Prods. Co., 486 U.S. 107, (1988).

In Bouman v. Block, 940 F.2d 1211 (9th Cir. 1991), the Ninth Circuit held that deferral was accomplished when the EEOC mailed a copy of the charge to the State Agency, which in this case is the Nevada Equal Rights Commission. And in Green V. Los Angeles County Superintendent of Sch., 883 F.2d 1472 (9th Cir. 1989), the Ninth Circuit upheld a worksharing agreement between the state agency and the EEOC which provided an automatic waiver when a complainant filed first with the EEOC.

Accordingly, since Bates filed her charge with the EEOC less than 300 days after the discriminatory action in August, 2000, her charge was timely.

### B.    **Title VII Protects Against Retaliation Directed Towards Third Parties Who Associate with Someone Who Engages in Protected Activity**

The County argues that Bates is not protected by Title VII even if she was denied a promotion because her supervisor, George Cotton, filed an EEOC complaint and lawsuit against the County, because Title VII doesn't protect third-party victims of retaliation. However, the County acknowledges that there is no Ninth Circuit precedent supporting its position.

Bates adopts the analysis and conclusion which the district court set forth in

5

<u>EEOC v. Nalbandian Sales, Inc.</u>, 36 F.Supp.2d 1206 (ED CA 1998).  In Nalbandian the court pointed out that it would defeat the purpose of Title VII to allow an employer to retaliate against a third-party when a discrimination complaint has bee filed against it.  "A construction that requires standing only where the employee himself has participated in activity giving rise to unlawful retaliation would leave all the other retaliated against employees without a remedy."  <u>Id.</u> at 1210.

The court also pointed to the fact that the EEOC recognizes third-party retaliation claims, and the federal courts historically defer to EEOC interpretations of Title VII.  "Deference to the EEOC's, the administrative agency authorized by statute to implement and enforce Title VII, construction of the remedial purposes of section 2000e-3(a) is entitled to deference."  <u>Id.</u> at 1212.  Obviously in this case the EEOC supports Bates' position that she is protected by Title VII, since the EEOC issued a finding of probable cause in her favor.

Accordingly, Bates believes that Title VII clearly covers third-party complains such as hers and thus her lawsuit should not be dismissed.

### C.    The Elements of a Title VII Retaliation Claim

Bates alleges she was terminated in retaliation for engaging in activity protected by Title VII.  To prove a prima facie retaliation claim a plaintiff must demonstrate that (1) she engaged in protected activity, (2) she suffered an adverse employment decision, and (3) there was a causal link between her activity and the employment decision.  <u>Folkerson v. Circus Circus Enter., Inc.</u>, 107 F.3d 754, 755 (9th Cir. 1997).  "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to

6

rise to the level of a preponderance of the evidence." <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994).

"Protected activity includes the filing of a charge or a complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to 'oppose' an employer's discriminatory practices." <u>Raad v. Fairbanks North Starborough</u>, 323 F.3d 1185, 1197 (2003), citing 42 U.S.C. § 2000e-3(a).

Once a plaintiff has proven her prima facie case of retaliation, the employer must proffer a justification for its action. At that point, the plaintiff must point to direct or circumstantial evidence which, if believed by the factfinder, would prove that the explanation is pretextual. <u>Raad</u>, 323 F.3d at 1197. "[T]he plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Id.</u>

Most importantly, however, the defendant must use "admissible evidence" to counter the plaintiff's prima facie case. As the Supreme Court clearly stated:

> Under the McDonnell Douglas scheme, establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. To establish a "presumption" is to say that a finding of the predicate fact (here, the prima facie case) produces "a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination). Thus, the McDonnell Douglas presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case -- i.e., the burden of "producing evidence" that the adverse employment actions were taken for a legitimate, nondiscriminatory reason. The defendant must clearly set forth, **through the introduction of admissible evidence**, reasons for its actions which, if believed by the trier of

1  fact, would support a finding that unlawful discrimination was not the cause

2  of the employment action.  St. Mary's Honor Center v. Hicks, 509 U.S. 502,

3  507 (1993)(Citations and internal quotes omitted, emphasis added).

4  Once the plaintiff has proffered a prima facie case, the defendant must come

5  forward, using admissible evidence, with a legitimate non-discriminatory

6  explanation for its decision.

7  With respect to proving pretext, there are many ways to demonstrate pretext

8  sufficient to defeat a motion for summary judgment.  First, "[t]emporal proximity

9  between protected activity and an adverse employment action can by itself

10  constitute sufficient circumstantial evidence of retaliation in some cases."  Bell v.

11  Clackamas County, 341 F.3d 858, 865 (9th Cir. 2003).  Second, animosity toward

12  the plaintiff supports a finding of pretext.  Winarto v. Toshiba, 274 F.3d 1276,

13  1286 (9th Cir. 2001).

14  Third and fourth, the plaintiff may produce evidence that "his employer

15  expressed opposition to his [protected conduct], either to him or to others" or

16  evidence that "his employer's proffered explanations for the adverse employment

17  action were false."  Keyser  v. Sacramento City Unified School District, 265 F.3d

18  741, 751-52 (9th Cir. 2001).  Finally, any combination of the above may be used to

19  demonstrate pretext.  E.g., Bell, 342 F.3d at 866 ("the temporal proximity between

20  Bell's complaints and the alleged adverse employment actions, together with

21  evidence of Alderman's and Cadotte's contemporaneous displeasure with Bell's

22  complaints . . . regarding racial comments and racial profiling, provides strong

23  circumstantial evidence of retaliation.")

24  "When the plaintiff offers direct evidence of discriminatory motive a triable

25  issue as to the actual motivation of the employer is created even if the evidence is

26  not substantial. . . .  Direct evidence is evidence which, if believed, proves the fact

27  of discriminatory animus without inference or presumption."  Godwin v. Hunt

28

8

Wesson, Inc., 150 F.3d 1217, 1220-21 (citations and internal quotations omitted.) Furthermore, "Title VII does not require a disparate treatment plaintiff relying upon circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence." Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006). Accordingly, proof of a prima facie case together with any direct or circumstantial evidence is sufficient to defeat a motion for summary judgment!

### D. Bates Can Prove a Prima Facie Case of Retaliation

Bates can prove a prima facie case of third party retaliation. The County concedes that her supervisor, George Cotton, filed a charge of discrimination and a lawsuit based upon that charge. This is the first element of a prima facie case.

The County also concedes that Cotton recommended Bates for a reclassification, and that the recommendation was approved by Cotton's supervisor Beverly Glode and forwarded to the Assistant County Manager, Michael Alastuey in March, 2000, who denied the request in August, 2000. This is the second element of Bates' prima facie case.

With respect to the third and final element - proving a causal connection between the first two elements - Bates can prove that in several ways. The County concedes that in 1999 the Human Resources Department received five reclassifications and four or five competitive promotions. Affidavit of Ray Visconti, ¶ 12. Accordingly, the fact that EOD was denied reclassifications the very next year indicates that they were treated differently, and this difference occurred while Cotton's lawsuit was pending.

Additionally, there is the affidavit and deposition testimony that EOD was to be denied reclassifications, and that this was because of Cotton's lawsuit. Taken together, this evidence demonstrates a causal connection between the protected

9

activity and the adverse employment action.

### E.   The County Did Not Meet Its Burden to Offer Admissible Evidence to Prove Why It Denied Bates' Reclassification

As Bates stated above, it is the defendant's burden, when faced with evidence of a prima facie case of discrimination, to proffer, *through admissible evidence*, a non-discriminatory explanation for its action.  The County has failed to meet this burden, since the explanation they have provided is inadmissible hearsay. Mr. Visconti can't testify to what Mr. Alastuey said when he denied Bates' reclassification, that is clear, inadmissible hearsay.

Accordingly, since the County has failed to rebut Bates' prima facie case, the motion for summary judgment must be denied.

### F.   Bates' Evidence of Pretext

In the event that the Court disagrees with Bates' position that the County has failed to meet its burden of production, or if the County supplements its brief with an admissible affidavit, the Bates points to the following evidence to support her assertion that there are questions of fact surrounding her retaliation case.

The law in the Ninth Circuit is clear, any direct or circumstantial evidence is sufficient to defeat a motion for summary judgment.  Thus the EEOC letter of determination (PE 1) is sufficient evidence.

Additionally, the evidence cited above which shows that EOD employees were treated differently than other County employees also demonstrates pretext. Finally, there is the statement by the Finance Department employee who told Bates that she was instructed not to approve any reclassifications in EOD because of Cotton's lawsuit.  Collectively, all of this evidence is more than enough to demonstrate that the County's proffered explanation is pretextual.

10

## CONCLUSION

Summary judgment should be granted in only the rarest of occasions, particularly when the EEOC has made a determination in the plaintiff's favor. Based upon the evidence contained in the County's brief and the evidence submitted by Bates, it is clear that summary judgment is inappropriate in this case.

DATED this 12 day of June , 2006.

RICHARD SEGERBLOM, ESQ.
704 South Ninth Street
Las Vegas, NV  89101

11

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of June, 2006, I served the foregoing  by **CM/ECF Filing** - with the United States District Court of Nevada, a copy of the Court's notification of e-filing is **attached** to the hard copy for either faxing, mailing, overnight delivery, and/or hand-delivery.

Luther Snavely, Esq.
Garcia-Mendoza & Snavely
501 S. Seventh Street
Las Vegas, NV 89101-6903

I declare under the penalty of perjury that the foregoing is true and correct. Executed on June 12, 2006, at Las Vegas, Nevada.

/s/ John Greer
John Greer, employee of
RICHARD SEGERBLOM, ESQ.
Attorney  for Plaintiff

12

## **EXHIBIT LIST**

Exhibit 1 ............................................................................... 9/20/02 EEOC Determination

Exhibit 2 ...........................partial transcript of the deposition of Terry Lamuraglia 3/19/99

Exhibit 3 ...............................................................statement of George L. Cotton 4/16/2001

Exhibit 4 ..........................................................statement of Barbara Enright Bell 4/18/2001

EXHIBIT 1



OVERNMENT
COMMISSION

GOBIERNO DE LOS ESTADOS UNIDOS
COMISION DE IGUALDAD DE OPORTUNIDAD EN

STREET, 4TH FLOOR
CALIFORNIA 90012

ADD (213) 894-1221
FAX (213) 894-1118

Charge No.: 340A12092

Janice E. Bates                                    Charging Party
3681 Deer Creek Way
Las Vegas, NV  89115

Clark County                                       Respondent
P.O. Box 551100
Las Vegas, NV  89155-1100

## DETERMINATION

Under the authority vested in me by the Commission, I issue the following determination as to the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended.  All requirements for coverage have been met.

Charging Party, alleged that since January 2000 and continuing, she has been denied job reclassifications from Office Specialist to Office Administrative Secretary; and on 14 March 2001, she was again denied a job reclassification and her training duties were removed.  Charging Party amended her initial charge to include that on 7 December 2001, she discovered that Respondent had taken her out of her permanent position and placed her in a contractual position.  Charging Party believes that the above actions are in retaliation for her association with the Equal Employment Opportunity Director, George Cotton, who had filed an Equal Employment Opportunity Commission Charge of Discrimination, as well as because of her race, Black.

Respondent contends that it denied Charging Party's requests for reclassification to Office Administrative Secretary, and moved her from a permanent position to a contract position for legitimate reasons.

The preponderance of the evidence gathered in the Commission's investigation established Respondent retaliated against Charging Party because of her association with the Director of Equal Opportunity Division .  The evidence further revealed that Respondent retaliated against a class of individuals who were supervised by this Director.

**DETERMINATION**
**Charge No.: 340A12092**
**Page 2 of 2 pages**

Respondent is reminded that Federal law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in Commission investigations is also prohibited. These protections apply regardless of the Commission's determination on the merits of the charge.

Section 706(b) of Title VII requires that if the Commission determines that there is reasonable cause to believe that the charge is true, it shall endeavor to eliminate the alleged unlawful employment practices by informal methods of conference, conciliation, and persuasion. Having determined that there is reasonable cause to believe that the charge is true, the Commission now invites the parties to join with it in a collective effort toward a just resolution of this matter. Disclosure of information obtained by the Commission during the conciliation process will be made in accordance with 706(b) of Title VII of 1601.26 of the Commission's Procedural Regulations. Where the Respondent declines to enter into settlement discussions, or when the Commission's representative for any other reason is unable to secure a settlement acceptable to the office Director, the Director shall so inform the parties in writing and advise them of the court enforcement alternative available to the Charging Party and the Commission.

Please contact the investigator assigned to the case, Belynda A. Lindsey, by 26 September 2002 with a response. If you have any questions, please contact Ms. Belynda A. Lindsey at (213) 894-1043.

On Behalf of the Commission:

9/20/02
Date

Olophius Perry, District Director
Los Angeles District Office

EXHIBIT 2

EXHIBIT 2

# In The Matter Of:

## COTTON   v.
## ASKEW

---

## TERRY LAMURAGLIA
## March 19, 1999

---

## ASSOCIATED REPORTERS OF NEVADA
## CERTIFIED COURT REPORTERS
## 2300 W. SAHARA AVENUE
## SUITE 770
## LAS VEGAS, NV  USA  89102
## (702) 382-8778    FAX: (702) 382-2050

*Original File LAMU0319.99, 201 Pages*
*Min-U-Script® File ID: 2255758117*

# Word Index included with this Min-U-Script®

COTTON v.
ASKEW

---

Page 1

DISTRICT COURT
CLARK COUNTY, NEVADA

GEORGE COTTON,                    )
      Plaintiff,                  )
  vs.                             ) Case No.
                                  ) CV-S-98-1245-DWH(RJJ)
DALE ASKEW, in his official )
capacity; DALE ASKEW, in his)
individual capacity; CLARK        )
COUNTY, a political               )
subdivision of the State of )
Nevada; and ROES I-X, and         )
DOES I-X, inclusive,              )
      Defendants.                 )

DEPOSITION OF TERRY LAMURAGLIA
Taken on Friday, March 19, 1999
At 9:12 a.m.
At 810 South Casino Center Drive
Las Vegas, Nevada

Reported by: Kimberly E. Powell, RPR, CCR #484

---

Page 2

[1] APPEARANCES:
[2] For the Plaintiffs:    VALARIE I. FUJII, ESQ.
                 Kajioka Christiansen & Toti
[3]              810 Casino Center Boulevard
                 Las Vegas, Nevada 89101
[4]
      For the Defendants:    EVA GARCIA-MENDOZA, ESQ.
[5]              Garcia-Mendoza
                 & Snavely, Chtd.
[6]              501 South Seventh Street
                 Las Vegas, Nevada 89101
[7]
[8]
      Also Present:      GEORGE COTTON
[9]
[10]
[11]
[12]          I N D E X
[13] Witness    Direct   Cross   Red.   Rec.
[14] TERRY LAMURAGLIA
[15] (By Ms. Fujii)    4
[16]
[17]
[18]
[19]
[20]
[21]       INFORMATION TO BE SUPPLIED
[22]          Page      Line
[23]              (None)
[24]
[25]

---

Page 3

[1]                E X H I B I T S
[2]
       Number        Description        Page
[3]
        1        Memo from Beverly Glode to
[4]              All Human Resource Managers
                 Dated 5-15-98
[5]              Regarding Reorganization   48
[6]  2     Letter from Terry Lamuraglia
      to Beverly Glode Dated 5-21-98    55
[7]
        3        Memorandum from Beverly Glode
[8]              to All Human Resource Employees
                 Dated 6-1-98         102
[9]
        4        Position Audits, Human Resources
[10]             Department Conducted by Andrew A.
                 Gerrie, CCP dated 10-10-98 122
[11]
        5        Memo from Mary-Ann Miller to
[12]             George Cotton Dated 6-5-98 142
[13] 6     Clark County Board of
                 Commissioners Agenda Item  146
[14]
        7        George Cotton — E.E.O. Board
[15]             Involvement Dated 8-12-98  153
[16] 8     George Cotton Equal
                 Opportunity/Affirmative Action
[17] Plan Complaint Dated 7-27-98   158
[18] 9     Memo from George Cotton to Board
                 of County Commissioners
[19]             Dated 8-14-98       162
[20] 10    Memo from Shelleye Warner to
      Beverly Glode Dated 8-11-98    176
[21]
[22]
[23]
[24]
[25]

---

---

Page 4

[1] Thereupon—

[2]                 **TERRY LAMURAGLIA**

[3] was called as a witness by the Plaintiffs, and

[4] having been first duly sworn, testified as follows:

[5]              **DIRECT EXAMINATION**

[6]                **BY MS. FUJII:**

[7]   **Q:** Would you please state your name and

[8] spell it for the record.

[9]   **A:** Terry, T-e-r-r-y, Lamuraglia,

[0] L-a-m-u-r-a-g-l-i-a.

[1]   **Q:** Mr. Lamuraglia, have you ever had

[2] your deposition taken before?

[3]   **A:** Yes.

[4]   **Q:** On approximately how many occasions?

[5]   **A:** Maybe six.

[6]   **Q:** Other than those that were involving

[7] personal injury or divorce, did any of those

[8] involve civil-right allegation or allegations of

[9] civil-rights allegations?

[0]   **A:** Yes.

[1]   **Q:** What occasions were those?

[2]   **A:** I believe it was — the last one was

[3] Gene Harper, an employee of the University Medical

[4] Center a few years ago.

[5]   **Q:** Approximately 1996?

---

Page 5

[1]   **A:** I think so.

[2]   **Q:** Any others?

[3]   **A:** It's been maybe six or seven years.

[4] It would have been with the Black Fire Fighters

[5] Association — Clark County Black Fire Fighters

[6] Association.

[7]   **Q:** May I ask, when you testified or had

[8] your deposition taken in the Harper and the Black

[9] Fire Fighters case, in what capacity were you

[0] serving for the County?

[1]   **A:** For Harper, I was the assistant

[2] director of human resources for the Clark County.

[3] With the Black Fire Fighters Association, it was

[4] the vice president of Clark County Fire Fighters,

[5] Local 1908 and secretary/treasurer of the

[6] Professional Fire Fighters of Nevada.

[7]   **Q:** In your opinion, was your testimony

[8] in the Gene Harper case approximately 1996 when you

[9] testified as the assistant director of human

[0] resources more favorable to the plaintiff or to the

[1] defendant?

[2]   **MS. GARCIA-MENDOZA:** I would object

[3] as irrelevant.

[4]   **Q:** (BY MS. FUJII) In your opinion.

[5]   **A:** What do I do now?

---

Page 6

[1]     **Q:** From time to time Counsel will make

[2] objections. Unless she instructs you not

[3] to answer —

[4]     **MS. GARCIA-MENDOZA:** Well, let the

[5] record show I am not here as Mr. Lamuraglia's

[6] attorney. He has indicated he doesn't want me to

[7] represent him. So he's on his own. So I can't

[8] instruct him not to answer.

[9]     **MS. FUJII:** Thank you for the

[10] clarification.

[11]     **THE WITNESS:** After deposition, I was

[12] volunteered by the County's attorney.

[13]     **MS. GARCIA-MENDOZA:** I'm going to

[14] object. Now that's attorney-client privilege

[15] between County employee and the County's attorney,

[16] and that he cannot talk about.

[17]     **MS. FUJII:** The fact there was a

[18] settlement probably isn't privileged but what the

[19] settlement was is.

[20]     **Q:** (BY MS. FUJII) So I'll ask just in

[21] your opinion and try and put it in a way that maybe

[22] doesn't divulge any confidential information or

[23] what you think would be confidential information.

[24]     Was your testimony more favorable to

[25] the plaintiff or the County?

---

Page 7

[1]   **A:** County.

[2]   **Q:** And in the Black Fire Fighter

[3] instance, you were testifying as a representative

[4] of the fire fighters —

[5]   **A:** Union, yes.

[6]   **Q:** — in that capacity, was your

[7] testimony more favorable to the plaintiff or the

[8] defendant?

[9]   **A:** This one is interesting. It was the

[10] Union. They were a third party. They had to be a

[11] part of the lawsuit.

[12]   **Q:** Oh, I didn't know that.

[13] In your opinion, did you find there

[14] was discrimination against the Black Fire Fighters

[15] in that case?

[16]     **MS. GARCIA-MENDOZA:** I'm going to

[17] object as not competent to make that finding.

[18] Mr. Cotton has already testified as to what his

[19] finding was.

[20]     **THE WITNESS:** What's the question?

[21] Say it again?

[22]   **Q:** (BY MS. FUJII) Also you still can

[23] answer when I make objections.

[24]     In your opinion, in your involvement

[25] in the Black Fire Fighters case, did you feel there

**Page 96**

[1] was told that only a certain percentage would be
[2] given by the County manager. He had a policy. I'm
[3] not going to give more than this.
[4]   Q: What was his policy?
[5]   A: I don't remember exactly what it was.
[6]   Q: Say we use —
[7]   A: We use no more than 4 percent I
[8] believe it was at that time.
[9]   Q: That was the understand policy of
[10] County manager Dale Askew?
[11]   A: Yes. That was the direction I
[12] received to try to change in contract negotiations,
[13] our specific contract language to get a better
[14] handle on increases throughout the County and to
[15] standardize it a little more the evaluation process.
[16]   Q: So make it more specific for me when
[17] dealing with these two minorities within George
[18] Cotton's department, how were they treated
[19] different by the County manager as opposed to other
[20] Caucasian employees?
[21]   A: Even though the E.O.D. office — and
[22] it gets a little confusing — was either part or
[23] not a part of human resources, when I was assistant
[24] director, look at all the merit adjustments for all
[25] the employees within our own department, I want to

**Page 98**

[1] standard here and it's different than the standard
[2] over here, there's a problem.
[3]   Q: And you were saying there was a
[4] problem in one division. What distribution were
[5] you referring to?
[6]   A: E.O.D.
[7]   Q: And that's Mr. Cotton's division?
[8]   A: Yes.
[9]   Q: Is it a fair statement in that
[10] division there's more minority than other
[11] divisions?
[12]   **MS. GARCIA-MENDOZA:** Objection.
[13]   **THE WITNESS:** Yes.
[14]   **MS. GARCIA-MENDOZA:** Leading.
[15]   Q: (BY MS. FUJII) And were the
[16] inequalities of that division compared to other
[17] divisions as a result of decisions made by County
[18] manager Dale Askew?
[19]   A: I don't totally understand it. But
[20] we are — in human resources, we're very aware of
[21] the makeup. That's one of the things we do. We
[22] have to recognize that. That's our job. And,
[23] therefore, when it's not there, when you don't
[24] recognize it, it's a problem. It's a huge problem,
[25] and you move to correct it. We do that with most

**Page 97**

[1] make sure that we're all using somewhat the same
[2] standards. So all the employees were on equal
[3] ground.
[4]   Q: So they all get no more than the
[5] 4 percent increase?
[6]   A: Well, some do get above that. I
[7] never set a ceiling in there. There were many
[8] employees who got well over 4 percent.
[9]   Q: But you're saying you saw a pattern
[10] of unequal treatment?
[11]   A: No. I was aware that one division —
[12] now, I don't know the exact time frame where this
[13] division was part of human resources or not. But
[14] at the time I was aware that two individuals could
[15] not get any more than that.
[16]   And when you look across the board at
[17] the different divisions between human resources,
[18] what we've tried to do is standardize that, make it
[19] equitable so everyone that's in the same position
[20] from one division to another — if they're an
[21] analyst one, in one division it's pretty much the
[22] same or the majority of their evaluations should be
[23] evaluated on that position across the board.
[24] Analyst one, anywhere in the divisions of human
[25] resources. But if you set a ceiling over here, one

**Page 99**

[1] of our divisions.
[2]   Q: And you saw a problem with Mr. — the
[3] treatment of Mr. Cotton's division?
[4]   A: Yes.
[5]   Q: And that being the merit increases of
[6] certain minority employees?
[7]   A: Yes. This had come up before, and
[8] that's why it's heightened here with Kelvin
[9] Atkinson, an African American. He may have been an
[10] analyst too at the time. He brought it to our
[11] attention that other employees, white employees,
[12] were eligible to receive increases above that. So
[13] it was already there. It was already in our mind.
[14]   Q: So is it a fair statement that
[15] comparable employees in other divisions to those of
[16] those minorities in George's divisions were getting
[17] higher merit increases?
[18]   A: I know there was a ceiling on the
[19] E.O.D. division. There was a ceiling there. It
[20] was put there. That was it. There was no way
[21] around that one. That's what you're told. That's
[22] what you do.
[23]   Q: I apologize. But there was no
[24] ceiling placed on other divisions?
[25]   A: No. No.

Page 100

[1]   Q: And who —
[2]   A: No, because the plan allows for zero
[3] to 6 percent. In Kelvin Atkinson's case, to give a
[4] little bit more on that one, it was further
[5] discussed. Once that's brought up, we go into it a
[6] little bit further with his direct supervisor, and
[7] it was a work-performance situation.
[8]   Q: Okay.
[9]   A: And they're dealt with that way
[10] according to the system, which you have in place.
[11] Over in another division, though, if you have a
[12] ceiling, it may be zero to six, and that was one of
[13] the things we were directed to work on in contract
[14] negotiations. This had come up prior to that.
[15]   Q: Who operated the ceiling on George's
[16] division as to how much you could get as merit
[17] increases?
[18]   A: The County manager.
[19]   Q: Based on your capacity and knowledge
[20] and approval of these, did this have a
[21] discriminatory impact on Mr. Cotton and his
[22] employees?
[23]   MS. GARCIA-MENDOZA: Objection.
[24] Legal conclusion.
[25]   THE WITNESS: In my different

Page 101

[1] positions, it was two things. Yes, it's
[2] discriminatory. The other is an interpretation of
[3] the collective bargaining agreement, the ones that
[4] still apply to all of us even though we cannot
[5] belong to a Union.
[6]   Those benefits, or that part of the
[7] system, is used to evaluate us. So we're — at
[8] least those individuals in Mr. Cotton's office. So
[9] the system allows for zero to six. When you set a
[10] four, it violates that. To me, that's very clear.
[11] The other is hard to grasp. It's discriminatory
[12] looking at it in my position as drawing this line
[13] here between one division and another one.
[14]   Q: (BY MS. FUJII) That being George
[15] Cotton's department and others?
[16]   A: Yes. I, as an employee/labor
[17] relations manager, did give out increases over
[18] 4 percent for those individuals that I supervised
[19] directly.
[20]   Q: But you understand that the County
[21] manager — that you couldn't for individuals in
[22] Mr. Cotton's department?
[23]   A: Yes. I was directed that along with
[24] Bonnie Rinaldi had directed me at that time not to
[25] reclassify individuals in those divisions. She

Page 102

[1] specifically said — she wrote a note. I gave it
[2] to Oly Embry. She may still have it.
[3]   There will be no reclassifications in
[4] E.O.D. and I told her at that time that wouldn't
[5] be correct. I said you had better add O.D.C.
[6]   She said okay.
[7] And I think I thought about it a day
[8] or two later, and I said you better make it across
[9] the board with all of human resources.
[10]   Q: Okay.
[11]   A: So she made that change and corrected
[12] it with Oly Embry, who may have sent out a memo
[13] that would be a freeze on reclass of positions.
[14]   Q: I'm now going to hand you what I will
[15] mark as 3 Plaintiff's Exhibit 3, a memorandum —
[16]   (Plaintiff's Exhibit 3 was marked
[17] for identification.)
[18]   Q: (BY MS. FUJII) — from Beverly
[19] Nelson Glode, director of human resources to all
[20] human resources re: employees. The subject,
[21] again, is the reorganization. However, this is
[22] dated June 1, 1998. Do you recognize this
[23] document?
[24]   A: Yes.
[25]   Q: Do you recall when you received this

Page 103

[1] document?
[2]   A: Yes. I'm sorry. There were so many
[3] of them. It's been a while.
[4]   Q: This refers to a reclassification
[5] study, as you see on the bottom of page 1, doing a
[6] ratio analysis of managers to employees. Do you
[7] see that?
[8]   MS. GARCIA-MENDOZA: Ratio.
[9]   MS. FUJII: Ratio, yes.
[10]   Q: (BY MS. FUJII) Of managers to
[11] employees within the human resources department
[12] compared to others. Do you see that?
[13]   A: Yes.
[14]   Q: This reclassification study was done
[15] after — well, let me ask you. Was it done before
[16] or after E.O.D. was moved under human resources?
[17]   A: Everything was after.
[18]   Q: Could it have been done before E.O.D.
[19] was moved under human resources?
[20]   MS. GARCIA-MENDOZA: Objection.
[21] Speculation.
[22]   THE WITNESS: This chart?
[23]   Q: (BY MS. FUJII) Yes.
[24]   A: This chart is wrong. This isn't
[25] correct. This chart — if that's what you're

EXHIBIT 3

EXHIBIT 3

This statement is offered in support of <u>George Michael Kirkpatrick's</u> [Michael's] claim that he has been performing the duties as this Division's only Senior Human Resource Analyst since September 5, 1998. Barbara E. Bell, the previous Senior Management Analyst, was reassigned to the Administration Division within the Clark County Human Resources Department. All of her former job duties and functions not only remained within this Division, but also were assigned to and completed by Michael.

During February of 2000, a position reclassification request was authorized and advanced forward for Michael to be non-competitively reclassified to the senior analyst position. The Director of Human Resources, Beverly N. Glode, and the Director of Finance, George Stevens, each gave signature approval for his reclassification. No other reclassifications completed for Human Resources, except those generated for the two Equal Opportunity Division employees, have been held to this standard. The authorization was then forwarded for Michael Alastuey's [Assistant Clark County Manager] signature.

Our supplemental budget that year also contained an additional separate request for each Equal Opportunity Division analyst to be reclassified as Senior Analyst, duplicating reclassifications completed for other similarly situated employees within other Human Resource divisions; namely Employee Labor Relations and Recruitment.

During February of 2001, Michael had also attempted to further himself by applying through the competitive promotional process for the Senior Analyst position. Again, there were a total of five promotional positions available. The Human Resources Director, Beverly N. Glode, and the Assistant Director, Raymond Visconti, were already aware, due to a previous job audit, that Michael had been performing at the Senior Analyst level for well over a year. Regardless, he was not selected to fill any of the vacant Senior positions. After they granted these promotions, both admitted, according to Michael, to not even reading Michael's application and claimed to be completely unaware of his previous work experience. Mr. Kirkpatrick has indicated to me his belief that it was common knowledge within the Human Resources Department that the selected candidates had an *"inside track."*

None of the above actions have proven successful for Michael, or any other member of my staff, <u>past or current</u>.

Since the filing of my own charge of *Title VII* discrimination against Clark County, there has been a very noticeable difference in the way reclassifications and/or promotions are administered. All of the reclassifications occurring within the Human Resources Department have been completed without any of the dubious audit functions being performed, and this Division has been totally excluded from receiving any such promotional advancements. This also pertains to budget under-fills for a higher paying job classification, promotion-training under-fills, acting pay while working out of class, salary adjustments based upon midpoints of the incumbent's salary grade, and reclassification-promotional opportunities that were never offered or made available for EOD employees to even apply for. It appears that any employee who has ever associated himself or herself with me as an employee of the Clark County Equal Opportunity Division has experienced the effects of retaliation and has been the recipient of ongoing adverse employment actions as a result of such workplace association with me.

GEORGE L. COTTON

MANAGER OF EQUAL OPPORTUNITY DIVISION, APRIL 16, 2001

Subscribed & Sworn same this 16ᵗʰ Day of April, 2001.
By Shawna Dudas. Notary Public - State of Nevada, County of Clark.



SHAWNA DUDAS
Notary Public, State of Nevada
Appointment No. 95-1410-1
My Appt. Expires May 9, 2004

EXHIBIT 4

EXHIBIT 4

April 18, 2001

To Whom It May Concern:

I worked for the Equal Opportunity Department (EOD) until September 4, 1998 as a Senior Management Analyst. It wasn't clear when I would be transferring to the Labor Division of HR, and I began training Michael several months in advance of the move.   When I transferred to the Labor Division in September, 1998, these following functions were then assigned to Michael Kirkpatrick:

*   Oversee financials: accounts payable, budget preparation and tracking of the annual departmental operating, capital and supplemental budgets, over $500K annually;
*   Oversee the Countywide Americans With Disabilities Act (ADA) capital funds, over $1,000,000 at the time I left EOD; which included ensuring the integrity of the expenditures in the fund through periodic audits, that available funds were provided for future expenditures, and that proper documentation was prepared prior to utilizing the funds. for overseeing ADA capital budgets.
*   Oversee others' investigations as lead investigator; investigated and made recommendations on cases as well as reviewed  other staff members' recommendations.  In addition, Mr. Kirkpatrick trained new employees for their first six months in EOD.

Please note, while EOD is and has been a division of HR for about three (3) years, until recently, EOD employees were openly excluded from HR promotional opportunities.  Language such as "centralized HR experience only," were added to the minimum qualifications, which barred EOD employees from qualifying for other positions within HR, since the division was physically located on a different floor. As an example, I applied for one such position, and was told that I did not qualify because I didn't have that "centralized HR experience," until I moved to one of the other divisions and gained that experience.   I then transferred to another division in September, 1998 for better promotional opportunities.  Despite promises to the contrary, to this date, I still have not been promoted.

While the exclusionary wording may have been eliminated in this last senior and principal analyst recruitments (February, 2001), they were for three (3) other divisions, not EOD. This has been the case since EOD became part of the Human Resources Department, in spite of the fact that my senior analyst position and another position had been removed and were never replaced.

Please feel free to contact me if you have any questions or need clarification.

Sincerely,

Barbara Enright Bell

Barbara Enright Bell

**REDACTED**

S.E. NORIEGA
Notary Public - Nevada
No. 99-54848-1
My appt. exp. Apr. 22, 2003